IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT
ABERDEEN DIVISION

DANNY L. GRIMES

VS.                                                                        CIVIL ACTION NO. 1:12CV137-DAS

BNSF RAILWAY COMPANY

## MEMORANDUM OPINION

This matter is before the court on motion of the defendant for summary judgment (# 60). After considering the motion and the response thereto, the court finds as follows:

## I. FACTS

On April 18, 2010, Danny Grimes was working as a certified locomotive engineer for BNSF Railway Company. Specifically on that day, Grimes, along with Seawood Johnson and Stephen Burpo, was coupling together three locomotives for an outbound train. Although neither Johnson nor Burpo were certified to operate a locomotive, it is undisputed that Johnson did so and unintentionally caused the "rough coupling" of his engine with the engine on which Grimes stood. As a result, Grimes fell from the car and suffered injuries, including injuries to his head, chest, and the lower part of his right leg.

Shortly thereafter, Grimes called Trainmaster Brian Hauber to report his injury, and Hauber came to the scene. When Hauber arrived, Grimes explained that he must have mis-stepped and fallen from the engine. Hauber then asked Grimes whether he needed an ambulance, and Grimes told him he did not. Indeed, Grimes told Hauber he would go with him and show him where the accident occurred. Hauber then asked Burpo what happened, and Burpo said he did not know. Burpo explained that when he came around the side of the engine,

1

he saw Grimes on the ground and thought he may have been having a heart attack. Seawood Johnson subsequently signed a statement consistent with Burpo's explanation that he also found Grimes on the ground. At no time on April 18 did any of the three mention the rough coupling or that Johnson had been operating a locomotive.

Following his examination of the scene, Hauber drove Grimes to the hospital, and while at the hospital, Grimes completed a personal injury report. On that report, Grimes wrote his accident occurred when he "mis-stepped going from loco to loco." He also checked a box marked "no," when asked "[w]as the accident caused by the conduct of another person?" At about 11:00 the next morning, still unclear as to how Grimes had fallen, Hauber called him, and Grimes told him he "might" have been crossing between a 3180 and a 7538, two separate engines. Hauber then told Grimes he would be collecting tapes made from the security cameras to confirm or clarify how the accident occurred, and Grimes stayed with his previous explanation.

Finally at approximately 6:00 that night – April 19 – Hauber again called Grimes and asked if he would come to the yard and perform a re-enactment of the accident. At this point, for the first time, Grimes told Hauber that the previous explanation was not "the entire story." Grimes then told Hauber that Johnson had been operating an engine and ran it into the back of the engine on which he had been standing. When Hauber asked why Grimes had withheld this information until then, Grimes told him he had done so to protect Burpo and Johnson.

Immediately after receiving this new explanation, Hauber telephoned Burpo and asked why he had not previously provided it. Burpo explained that Hauber never directly asked them what they were doing when the accident occurred and then explained that Johnson drove the

2

engine into the engine on which Grimes had been standing. Hauber then called Johnson who said he had been operating the locomotive and made a rough coupling. Johnson said that was all he remembered before he found Grimes on the ground. After receiving this information, BNSF conducted a formal investigation of all three individuals involved in the accident as it is required to do under the Collective Bargaining Agreement ("CBA"). The Grimes investigation included a hearing before Ed Ferris, the Superintendent of Operations for BNSF out of the Springfield Division based in Memphis, Tennessee. During the hearing, both BNSF and Grimes, who was represented by union representative George Haskins, were able to provide witnesses and any evidence they believed to be relevant. Once a witness testified, the opposing side was given the opportunity to cross-examine the witness. After the investigatory hearings covering many hours and numerous witnesses, BNSF terminated Grimes, Burpo, and Johnson for violating a number of rules, chief among them GCOR[1] 1.2.7. Rule 1.2.7 provides: "Employees must not withhold information, or fail to give all the facts to those authorized to receive information regarding unusual events, accidents, personal injuries, or rule violations." Grimes challenged his dismissal and pursuant to the CBA, a Public Law Board considered his case, and while the board reinstated Grimes without compensation for time lost, it did find specifically:

> Our review of the record of the investigation shows that there was substantial evidence to support the Carrier's charge against Claimant. We know now that the injury suffered by him did not occur in the manner he first described to Trainmaster Hauber. His misrepresentation of those facts was not the result of his confusion on the day of the accident. If it were, he would not have been able to recount how the injury actually occurred. It is evident that Claimant was attempting to cover up the fact that he had permitted an unqualified employee to operate the locomotive.

---

[1]General Code of Operating Rules.

Following the board's decision, Grimes filed the present action, and the defendant has now moved for summary judgment, arguing *inter alia* that Grimes is unable to show that BNSF terminated him for engaging in a protected act; that is, reporting his injury in good faith. Although Grimes failed to convince BNSF during the investigation or the Public Law Board that he gave conflicting stories because he was confused on the day of the accident, he once again makes that argument in an attempt to create a genuine issue of material fact and defeat the defendant's motion. The court does not find such an argument compelling.

## II.  DISCUSSION

### A.  Summary Judgment

Summary judgment is warranted under Rule 56(c) of the Federal Rules of Civil Procedure if "[t]here is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. The nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324.

On motion for summary judgment, "[t]he inquiry performed is the threshold inquiry of

determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (l986). To determine whether there is a genuine dispute as to any material fact, the court must consider "all of the evidence in the record but refrain from making any credibility determinations or weighing the evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)). The court must make all reasonable inferences in favor of the non-moving party, *Reeves*, 530 U.S. at 150; "however, a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence.'" *Id.* (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)).

### B. Analysis

The plaintiff filed the present action, alleging the defendant violated 49 U.S.C. § 20109. That section provides in pertinent part that a "railroad carrier engaged in interstate or foreign commerce . . . may not discharge . . . an employee" for notifying "the railroad carrier . . . of a work-related personal injury . . . ." The defendant disagrees, arguing it discharged Grimes for dishonesty. The parties also disagree as to how the court should analyze an allegation made pursuant to the statute. Citing a Third Circuit opinion, the plaintiff argues that the burden-shifting scheme differs from the *McDonnell Douglas* scheme. *See Araujo v. New Jersey Transit Rail Operations, Inc.*, 708 F.3d 152, 158 (3d Cir. 2013). Specifically, the plaintiff argues he must show by a preponderance of the evidence, that: (1) he engaged in protected activity; (2) BNSF knew that he engaged in protected activity; (3) he suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action. *Araujo*, 708 F.3d at 157

(citing *Allen v. Admin. Review Bd.*, 514 F.3d 468, 475-76 (5th Cir. 2008) (addressing the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century, "AIR-21")). Once the plaintiff makes a showing that the protected activity was a "contributing factor" to the adverse employment action, the burden shifts to the employer to demonstrate "by clear and convincing evidence, that the employer would have taken the same unfavorable personnel action in the absence of that behavior." *Allen*, 514 F.3d at 476.

The defendant, on the other hand, argues the *McDonnel Douglas* framework applies. That familiar framework may be summarized as follows: Under *Mcdonnel Douglas*, a plaintiff must first establish a prima facie case of retaliation. The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its employment action. If the employer meets this burden, the presumption of retaliation disappears. The burden then shifts back to the plaintiff to prove that the employer's proffered reason is actually a pretext for retaliation. *See Ameristar Airways, Inc. v. Administrative Review Bd., U.S. Dept. Of Labor*, 650 F.3d 562, 566-67. To make out a prima facie case under *McDonnel Douglas*, a plaintiff must prove: (1) that he engaged in protected activity; (2) that the employer had knowledge of this activity; (3) that the plaintiff suffered an unfavorable personnel action; and (4) that the circumstances raise the inference that the protected activity was a contributing factor in the unfavorable action. *Id.*

Consequently, whether the court analyzes the matter under the framework set out by the Third Circuit in *Araujo* or applies the *McDonnel Douglas* framework, the plaintiff must first show he was engaged in "protected activity." In the present case, that activity would be reporting a job-related personal injury but reporting it *in good faith*. 49 U.S.C. § 20109(a). With its motion, BNSF argues that because at the outset Grimes failed to disclose how the injury occurred, he was not engaged in a protected activity. Grimes responds that he was confused during the period

6

following the accident. He submits affidavit and deposition testimony to support this contention. As noted *supra*, however, Grimes made this argument both during the investigatory hearing and before the Public Law Board and his argument was unavailing. Indeed, the Public Law Board made the specific finding that he had not been confused but had been dishonest. As a result, the defendant argues he is estopped from making the argument again.

### C. Collateral Estoppel

In the Fifth Circuit it is well-established that "[t]he application of collateral estoppel from arbitral findings is a matter within the broad discretion of the district court . . . ." *Universal Am. Barge Corp. v. J-Chem, Inc.*, 946 F.2d 1131, 1137 (5th Cir. 1991) (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979)). Before the court looks to determine whether the doctrine actually works to preclude an issue, however, it must first determine whether applying the doctrine at all would be appropriate. To make that determination the court must "carefully consider whether procedural differences between arbitration and the district court proceeding might prejudice the party challenging the use of offensive collateral estoppel. The district court specifically must determine whether procedural opportunities available to the party in the subsequent action 'might be likely to cause a different result.'" *Id.* at 1137-38 (quoting *Parklane*, 439 U.S. at 332). The court is always aware that arbitral findings might "lack the supervisory scrutiny of authoritative review, giving rise to the argument that arbitration risks determinations based on irrelevant or hearsay evidence, or the personal whims of arbitral panel members." *Id.* at 1137. However, "a district court's discretion in deciding whether to give arbitral findings preclusive effect also keeps the risk of prejudice at an acceptable level, at least when the arbitral pleadings state issues clearly, and the arbitrators set out and explain their findings in a detailed written memorandum." *Id.*

In the present case, the process began with an investigation into the matter and an

investigatory hearing held on September 2, 2010. While that hearing was held by Ed Ferris – an employee of BNSF – Grimes was represented by his union representative along with a union representative present as an observer. At the outset, Ferris explained in part:

> This hearing will be recorded on a digital voice recorder. A written transcript will be prepared from the recordings of that transcript . . . and that transcript will be the official record of this investigation. Representatives will be given the opportunity in proper order, to question the testimony of others at this investigation and to present whatever information they may have.

Following that introduction, Brian Hauber, Amory Yardmaster Kenny Davis, Road Foreman of Engines and Trainmaster on the Birmingham Subdivision Johnny Graham, and Danny Grimes were called as witnesses. At the conclusion of Ferris' examination of each witness, Grimes' representative, George Haskins, cross-examined each of them. Additionally, at the conclusion of each witness' testimony, Ferris asked whether Haskins had any further questions. Ferris also asked Grimes each time whether he had any questions of the witnesses to which he responded he did not. Haskins did at one point state "I will reserve the right to recall" Hauber but did not do so. At the conclusion of the hearing, Ferris asked specifically: "Mr. Haskins, do you have any further information to introduce or witnesses you would like to question?" Haskins responded, "Um, no I do not." Ferris then asked Grimes: "Mr. Grimes do you have any further information to introduce or witnesses you would like to question?" Grimes responded, "No, I would like to make a statement for the record."

Grimes made his statement for the record and following that, Ferris asked again whether Haskins had any further testimony to add. Haskins then responded that he wanted to reserve the right to provide evidence "at some other later time . . . ." Ferris then explained, "We'll sure wait if you want to take the time now," but Haskins stated only, "I'll just wait till, if it, I think it becomes

8

necessary."

Shortly thereafter, BNSF made the decision to terminate Grimes, and pursuant to Article 29(A)(9) of the CBA, Grimes, through his representative, demanded a review and was granted one. Ferris conducted that review on October 15, 2010, and on December 20, 2010, wrote to Haskins, explaining, "This will confirm my decision as communicated to you at the conclusion of the review on October 15 that discipline as assessed to Mr. Grimes was fair and appropriate. As I communicated to you at that time, your request that Mr. Grimes be restored to service with all rights unimpaired and mention of the incident expunged from his personal record was respectfully declined."

Haskins then appealed that decision to the Public Law Board, stating Grimes' claim as:

> This is to request that Engineer D.L. Grimes be reinstated, paid for all time lost, paid for attending the investigation, with restitution for any loss of fringe benefits, and the discipline expunged from his record, including any reference to "operational tests" failures surrounding this incident, resulting from investigation held on September 2, 2010.

BNSF responded to this claim with an extremely detailed pleading, describing to the Board the complaint and a summary of BNSF's position; company background; Grimes' employment history; and its argument and authorities. The Board then considered the "entire record and all of the evidence," before providing its decision in a detailed memorandum that substantial evidence supported the allegations against Grimes. The Board then specifically found that Grimes had been dishonest, but found the discipline imposed – termination – excessive in light of his prior record and directed BNSF to reinstate him without compensation for time lost.

After reviewing the process, it is abundantly clear that Grimes and his representative were given every opportunity to present or challenge the evidence presented against him and did so in exhaustive fashion. The court is aware that Grimes alleged throughout the process and continues to

argue that the proceedings were not fair, but the court finds nothing to support these bald assertions and unsupported accusations. Consequently, the court finds that the arbitral proceedings, including the investigation and review, were procedurally adequate. The court, therefore, looks to determine whether the argument that Grimes was confused when he failed to disclose accurately how the accident occurred should be precluded.

To make that determination the court must find: (1) the issue before the court is identical to the issue previously litigated; (2) that the issue was fully and vigorously litigated in the primary proceeding; (3) the previous determination of the issue was necessary for the judgment in that proceeding; and (4) no special circumstances exist that would render preclusion inappropriate or unfair. *J-Chem, Inc.*, 946 F.2d at 1136.

*1. Identical to the issue previously litigated*

As to this first factor, the issue under consideration during the investigatory and arbitral proceedings – whether Grimes was dishonest or confused when he initially reported his injury – is identical to the issue now before the court. Indeed, virtually the entire twenty-seven-page cross-examination of Trainmaster Hauber conducted by Grimes' representative, Haskins, during the investigatory hearing, is a painstakingly detailed exploration of this issue. While the plaintiff was clearly unhappy with the proceedings held pursuant to the CBA, there can be no dispute that whether Grimes had been dishonest was the critical issue litigated.

*2. Whether the issue was fully and vigorously litigated in the primary proceeding*

As detailed *supra*, the issue before the court was both fully and vigorously litigated in the primary proceeding. Grimes' representative did an exceptionally thorough job, cross-examining each witness with detailed, exacting questions related to the issue, and as noted, was relentless in pursuing the appellate avenue available to him pursuant to the CBA.

10

*3. Whether the previous determination of the issue was necessary for the judgment in that proceeding*

A determination as to whether Grimes had been dishonest when he first reported his injury was virtually the only issue that was to be determined. Certainly such a determination was necessary. Had BNSF or the Public Law Board found Grimes to have been confused rather than dishonest on the day he reported his injury, Grimes either would never have been terminated or would have been reinstated with compensation for time lost.

*4. Whether there exist special circumstances that would render preclusion inappropriate or unfair*

Again as mentioned *supra*, Grimes' representative argued throughout the arbitral proceedings and again argues to this court that those proceedings were unfair. Specifically, Grimes argues that both Ferris and Robert McConaughey[2] were involved in the investigation of the April 18 accident but also sat as the ultimate decision makers concerning his termination. However, as both Ferris and McConaughey explain in their depositions – and it is made clear in the transcript of the investigation hearing – Brian Hauber conducted the investigation. Based on their positions as supervisors, Ferris and McConaughey were involved to some extent from the outset but neither were so involved as to render the investigation and hearing unfair. Ferris, for instance explained in detail during his deposition that he was not at the hospital on April 18; not involved in the reenactment; not on any of the phone calls between Hauber and Grimes; never interviewed Grimes; and not involved in who would be called as witnesses to the investigation hearing. McConaughey also explained: "I wasn't involved in the investigation of the incident. I just received information from Mr. Hauber specifically restricted to his conversations with Mr. Grimes and the other crew members, to make sure that statements were taken, that the specific information was gathered in the

---

[2]At the time of the events in question, Robert McConaughey was employed by BNSF as the General Manager of the Springfield Division.

form of the event recorder downloads, the camera video."

Grimes also makes much of the fact that it appears as if McConaughey made the decision to approve dismissal thirty minutes after receiving the transcript of the hearing, although he testified that he did so after reading the transcript for two hours. The court finds such inconsistencies after approximately four years insufficient to suggest a hidden agenda held by BNSF to rid themselves of Grimes, an employee with a previously spotless record. And again, Grimes and his representative were able to put on any evidence they felt necessary and cross-examine any witness BNSF chose to utilize. Finally, there is no suggestion whatever that the Public Law Board was in any way familiar with the incident prior to the final hearing.

Accordingly, the court finds the doctrine of collateral estoppel applies in this instance. As a result, there is no genuine issue of material fact as to whether the plaintiff was engaged in a protected activity. The plaintiff is estopped from arguing that he reported his injury in good faith, and thus, he cannot make the prima facie case necessary to pursue his action under 49 U.S.C. § 20109.

IT IS, THEREFORE, ORDERED that the defendant's motion for summary judgment (# 60) is hereby GRANTED.

SO ORDERED, this the 6th day of May 2013.

/s/ David A. Sanders
UNITED STATES MAGISTRATE JUDGE